UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


ANTOINE PEREZ,              *       Civil Action
                             *       No. 04-3094
     Plaintiff,         *
                             *       Section "S"
      v.               *
                             *       New Orleans, Louisiana
DEAN EQUIPMENT, INC.,   *       October 11, 2006
                             *
     Defendant.         *
* * * * * * * * * * * * * * *


HEARING
BEFORE THE HONORABLE MARY ANN VIAL LEMMON,
UNITED STATES DISTRICT JUDGE



APPEARANCES:

For Limit (No. 2) Limited:    Fowler, Rodriguez & Chalos, LLP
                                    By:  MAT M. GRAY, III, ESQ.
                                    400 Poydras Street, 30th Floor
                                    New Orleans, Louisiana 70130

For Dean Equipment, Inc.:    Steeg Law Firm, LLC
                                    By:  ALAN M. COHEN, ESQ.
                                    201 St. Charles Avenue, Ste. 3201
                                    New Orleans, Louisiana 70170

Court Audio Operator:        Cynthia Crawford

Transcriptionist:            Dorothy Bourgeois
                                    c/o U.S. District Court
                                    500 Poydras Street, Room C151
                                    New Orleans, Louisiana 70130
                                    (504) 589-7721


Proceedings recorded by electronic sound recording,

transcript produced by transcription service.

P R O C E E D I N G S

(Wednesday, October 11, 2006)

1         THE CLERK: Case Number 04-3094, <u>Antoine Perez v Dean</u>

<u>Equipment, Inc.</u>

        Counsel, please make your appearances for the record.

        MR. GRAY: Good morning, Your Honor.

        THE COURT: Good morning.

        MR. GRAY: I'm Mat Gray. I represent Limit in this

matter.

        We've filed a Motion for Rehearing in a case in which

you granted a summary judgment. It's a coverage case in which

there are some broad principles that you applied, but we felt

those principles are not applicable to the unique insurance

program in this case.

        Now, I did write a letter and I hope it was received

okay by you, because I was a little concerned.

        THE COURT: Well, you asked for the documents to be

sealed. You didn't ask for there to be an in-camera inspection

of the documents. It's two different things and it was sealed

and I don't suppose the reasons were sealed.

        MR. GRAY: No, the reasons were the problem, but

that's not that severe.

        THE COURT: The next day they were sealed. So, they

are sealed, but there was no way I would have looked at the

things you presented to me under seal and not given it to your

1    opponent.  Sealed doesn't mean not for the eyes of the

2    opponent.  Sealed means not for the eyes of the world.  So, I

3    apologize if there was a miscommunication.

4         MR. GRAY:  No, there was just a concern.  Ron Johnson

5    called me because he's defending the underlying suit and he was

6    concerned that it had conveyed some of his thoughts to the

7    Plaintiff attorney.

8         THE COURT:  Well, that's right and there's no way you

9    could avoid that, I mean not on a sealed document.

10        MR. GRAY:  Yeah.

11        THE COURT:  What I would have done if you had asked

12   that it be taken in the context of in-camera inspection, I

13   would have brought you in and discussed it with you and told

14   you what I could and could not consider.  It would have just

15   depended on how that conference would have gone.  But to ask me

16   to seal something does not keep me from presenting it to the

17   opponent.  Your opponent is always entitled to information that

18   the Court relies on in making a decision.

19        MR. GRAY:  I didn't mean them.  I meant the Plaintiff

20   attorney in the underlying case.

21        THE COURT:  Right.

22        MR. GRAY:  But they were consolidated and it just got

23   a bit mixed up I think.

24        THE COURT:  Right.

25        MR. GRAY:  If I might, there is in the opposing memo

1  an issue of whether you should consider the rehearing.  I don't

2  know if you want me to address that or not, but essentially my

3  position on that is that under the Vokel & Company Banting

4  Fifth Circuit case 1993 among others that a motion for

5  reconsideration is like a motion to amend or alter a judgment

6  and you have the power to reconsider in the interest of

7  justice.  It's within your sound discretion.  You can

8  reconsider based on error or law, or a mistake of fact, and you

9  have broad power in that respect.  So, I certainly think that

10  we have the right here to argue a Motion for Rehearing on your

11  granting of the summary judgment.

12       THE COURT:  Well, I granted you an argument on the

13  Motion for Reconsideration; that's why we're here.

14       MR. GRAY:  All right, thank you.

15       The basic argument that we're trying to make and

16  sincerely believe in is that the principle of law established

17  in the Steptore case, and prior to it the Peavey case, and

18  after it the Cudd Pressure case, all of which are cited in the

19  memoranda, was that -- and those were direct action suits were

20  an insurance company appointed the same attorney to defend

21  itself and defend the insured, and there was a conflict of

22  interest between the insurer and the insured and there were

23  issues of whether there was coverage based on the allegations

24  of the suit which gave rise to a conflict in the same attorney

25  representing the insurer and the insured.  The Fifth Circuit

1    stated two principles as to when waiver would apply -- not the

2    Fifth Circuit, the Supreme Court.  And I'm quoting on both of

3    them, they're not long.  "Labor principles are stringently

4    applied to uphold the prohibition against conflicts of interest

5    between the insurer and the insured which could potentially

6    affect the legal representation in order to reinforce the role

7    of the lawyer as the legal advocate of the insured."  I think

8    we agree with that.

9         The second principle is that in Steptore, as in

10   Peavey, as in Cudd, when the insured continues to undertake a

11   defense when its own interests, the insurer's interests are

12   adverse to the insured's, then you waive your coverage

13   defenses.  And that makes sense.

14        If you come in and appoint one attorney to represent

15   two conflicting interests and at that time you don't say,

16   "Whoa, we need a reservation of rights, so you get your own

17   attorney," there's a waiver and it makes sense.  Because they

18   don't talk in terms of the insured being prejudiced and these

19   cases aren't based so much on prejudice, but they're based on

20   conflict of interest.  And that runs through these cases that

21   establish this principle.  And when you read each of the cases,

22   you'll see there's a conjunctive "and" there's a conflict of

23   interest in all of them.  It's not simply assuming the defense

24   without a reservation of rights; it's also when there's a

25   conflict of interest between the insured and the insurer that

1  gives rise to the waiver doctrine of an intentional

2  relinquishment of coverage defenses.

3       The point we tried to make in our original brief and

4  in what I thought were strong contested issues of material

5  fact, the first point we tried to make is that in the Dean case

6  there was never a conflict of interest between the insurer and

7  the insured.  In the first instance both of them were not sued,

8  only the insured.  And Defense Counsel's only obligation and

9  only representation was of the insured, Dean Equipment Company.

10      The allegation of the complaint, and it's unusual,

11  whether this man was a Jones Act Seaman and crewmember on a

12  vessel, an airboat owned by Dean, those allegations are

13  excluded from coverage.  And it sounds odd, but I mean we agree

14  that the allegations of the complaint did not state a claim

15  that was covered.  There's a clear exclusion which no one has

16  really contested at this point.

17      But this soft MEL program that I've tried to describe

18  in my memoranda and in the declaration of Mr. Sprouse, and is

19  discussed in the testimony of Mr. Boggio, who is Morrison

20  Insurance Company the agent for Dean, representing Dean, he

21  said in the soft MEL program you're covering basically two

22  things.  You're covering liability of an insured if its

23  employee works on a third party's vessel, not a vessel owned by

24  the insured and you're covered Jones Act exposure for that.

25  But if the employer owns the vessel and doesn't get P&I

1  coverage, which they didn't have here which is available to the

2  owner of a vessel, the soft MEL program provides a defense.  It

3  doesn't provide coverage, but it provides a defense.  The

4  coverage provided is a defense.  And we contend in the

5  contested issues if it's contested that Morrison as Dean's

6  agent and Limit through Energy Marine and through itself knew

7  and agreed how this program would work, that a defense would be

8  provided although there's no coverage.

9       Ron Johnson, as defense counsel or any defense

10  counsel, did not have a conflict of interest not just because

11  they only represented Dean, but because no matter how the case

12  went there was no coverage other than to provide a defense as

13  this program operated.  It's a special limited so-called "soft

14  MEL" maritime employer's liability program.  And that was the

15  understanding that we contend between the parties.

16       Certainly it would be very easy and, frankly, when I

17  was sent this case late in the game and issued the reservation

18  of rights worried about Steptore, I said, "Well, nothing's

19  covered here.  Why didn't you just deny coverage?  Why did you

20  provide a defense?"  This wasn't it might be covered, it might

21  not be covered.  Jones Act allegations on an insured vessel are

22  clearly not covered.  Why did you all provide a defense?  I

23  mean I asked this myself to my client.

24       He said that's the way the program works.  The

25  assured advised us for the last five years in his applications

1   that it did not have Jones Act Seamen working for it.  When

2   Defense Counsel conducted their investigation with the assured

3   we were told that the man worked one hour a day on the vessel,

4   so he could not be a seaman, and under those conditions we give

5   them a defense.  We don't cover the liability if it's proven,

6   but we give them a defense.  We go beyond the pleadings not to

7   deny a defense, but to create one.

8         So, you know, obviously Limit feels very concerned

9   about the situation about this type of program, but it is sort

10  of a unique situation where the insured actually getting a

11  benefit has no detriment and there is no conflict no matter how

12  the facts develop in the case.  So, we felt that being no

13  conflict the underlying principle to trigger a waiver doesn't

14  exist.

15        If you really look at the reason for it and if you

16  look at the language of Steptore, Peavey, and Cudd Pressure

17  Control, they all say, "and there is a conflict of interest,"

18  because that's where you're in bad territory.  And in cases

19  like Steptore and some others there was a gross conflict of

20  interest where the defense attorney for both parties turned on

21  the insured and filed summary judgment on behalf of the

22  carrier, which was a ridiculous thing to do.  I think it's

23  unethical among other things, but I don't want to -- I hate to

24  accuse those attorneys, but you just don't do that, it's

25  inappropriate.

1          And so the Supreme Court issued <u>Steptore</u>, and it

2     happened in <u>Peavey</u> and they said, "You can't do this."  You

3     can't proceed with the defense when you have a conflict of

4     interest.  That's putting the attorney in a bad position and

5     it's violating basic principles that are important to

6     protection of insureds.

7          And our point is that at least in this case there's a

8     material issue of fact.  If not, actually I was going to file a

9     summary judgment the other way that by agreement between

10    Morrison on behalf of Dean, and Dean professes not even to have

11    read their policies, but Morrison is an experienced retail

12    broker and they're acting for Dean.  And if you look at the

13    testimony of Energy Marine, who are the surplus lines broker

14    who placed the policy in London, and the declaration of

15    Mr. Sprouse and the adjuster for Limited London on how this

16    program worked and how it has worked, that Limit was only

17    extending a benefit to Dean.

18         And now Limit says, and I sort of agree with them,

19    "What's happening here?"  I mean everyone knew there's no

20    coverage.  In his deposition Mr. Boggio, the adjuster for

21    Morrison the insured's agent, repeatedly said, "I told Troy

22    Williams, the president of Dean, repeatedly that he had no

23    coverage for crewmember claims on owned vessels," and other

24    matters were discussed, but this was five years of policies.

25         So, I think it's clear, at least it's unclear enough

1    to be a material fact as to how this program was designed to

2    work as to whether there was a conflict, and I don't see any

3    conflict of interest, and whether the broad principle of

4    Steptore and waiver should be applied in these facts in this

5    insurance program as agreed between Morrison and Limit.

6              I think those are my main points, Judge.  If you have

7    some questions, I'd be happy to address them.

8              THE COURT:  Thank you.

9              MR. GRAY:  Thank you.

10             MR. COHEN:  Your Honor, my name is Alan Cohen.  I

11   represent Dean Equipment.

12             Before I respond to Mr. Gray's specific arguments and

13   begin my defense of this Court's ruling, I would like to

14   address what we're here on today.  We're here on a Motion for

15   Rehearing, and Rule 59 of the Federal Rules of Civil Procedure

16   specifies the limited grounds on which the Court can grant a

17   rehearing when the Court has already made a decision on a

18   ruling.  Rule 59 the jurisprudence interpreting it says that

19   there has to be some new evidence that has come to light which

20   couldn't have been discovered prior to the original hearing,

21   that there has to be a change in the controlling law, or that a

22   manifest injustice must have been done at the original hearing.

23   None of those grounds have been alleged nor could they be

24   alleged in this case.

25             The Motion for Rehearing was originally set in mid

1    August.  We granted Limit a continuance so that it could have

2    additional time to file an opposition and it was then set for

3    hearing at the end of August.  So, Limit had ample time to file

4    an opposition.  It filed an opposition and there was no

5    manifest injustice here.

6         Now, I'll move on to my defense of the Court's

7    ruling.  As the Court is aware, it's well settled under

8    Louisiana law that if an insurer assumes and continues the

9    defense of a claim made against the insured in view of facts

10   indicating non-coverage without obtaining a non-waiver

11   agreement, then the insurer waives any coverage defenses which

12   may have been available to it.

13        The only issue that was before the Court on the

14   Motion for Summary Judgment was whether or not Limit had

15   knowledge of facts indicating non-coverage well in advance of

16   the date that it reserved its right or attempted to reserve its

17   right to deny coverage.  You'll recall that the Jones Act suit

18   filed by Mr. Perez was filed and Limit received a copy of it in

19   December of '04.  Limit didn't reserve rights -- attempt to

20   reserve rights until August of '05.  In between that time

21   Counsel retained by Limit to represent Dean, the Johnson firm,

22   sent a preliminary report to Limit in which it advised Limit

23   specifically of the exclusion which Limit now relies upon which

24   Limit referred to in its August reservation of rights letter.

25   So, there's no reason that Limit could not have reserved its

1    right to deny coverage well in advance of August 15th.

2            Now, I'd like to discuss -- Mr. Gray went into the

3    jurisprudence Steptore, and Peavey, and North American, the

4    various cases dealing with waiver interpreting Louisiana law,

5    but I think he misconstrues those cases in the sense that he --

6    I think he misconstrues what the Court is talking about when it

7    talks about a conflict of interest.

8            Whenever an insurer provides a defense of claims for

9    which there is no coverage, as a matter of law a conflict of

10   interest exists, because as a matter of law when the insurer is

11   providing the defense of claims that are not covered, the

12   parties are adverse.  And clearly Limit and Dean are adverse

13   because we're here today in litigation that we've been involved

14   in for a year.  So, to suggest that there's no conflict of

15   interest between the parties is wholly without merit and I

16   think it misconstrues the jurisprudence.  There's a conflict

17   whenever the insurer is defending claims for which there's no

18   coverage.

19           So, then the only issue goes back to when could the

20   insurer have known that there was no coverage for these claims?

21   Well, what Mr. Gray is arguing in support of his Motion for

22   Rehearing is that everybody knew back in December of '04 when

23   we first got the lawsuit that there was no coverage for these

24   claims.  So, all Limit had to do in this case was issue its

25   reservation of rights in December of '04 and then provide its

1    defense.

2           The various cases that are cited in all of the briefs

3    make no distinction between the types of policies.  What

4    Mr. Gray is arguing is that this specific type of policy that

5    the rule of Steptore, and the rule of Peavey, and North

6    American, and Cudd, that the rule enunciated by the courts in

7    those cases does not apply because this is a unique policy.  In

8    none of those cases do the courts go into the policies, do they

9    discuss the different types of policies.  What they do say is

10   that whenever you have a liability policy that requires the

11   insurer to provide a defense, the insurer, it's a well-settled

12   principle of law, must provide a defense unless the allegations

13   in the petition unambiguously exclude coverage.  So what that

14   means is that in almost every case the insurer's defense

15   obligation is going to be broader than its indemnity

16   obligation.  For that reason the courts have said that once the

17   insurer is aware that it is defending claims which are not

18   covered, it must timely reserve its rights.  And that did not

19   happen here.

20          Clearly, Limit knew back in December or January that

21   it was defending claims which were not covered, but it didn't

22   issue the reservation of rights.  And the danger, the reason

23   for Steptore, and the reason for Peavey, the risk that the

24   courts were trying to prevent is exactly what happened here,

25   because you had the Johnson firm, which was retained to defend

1   Dean Equipment but which was being paid by Limit reporting

2   directly to Limit and advising Limit of the exclusion which

3   Limit now relies upon in denying coverage.  That is precisely

4   what the courts were attempting to prevent and that's precisely

5   what occurred here.

6           The courts make no distinction between a direct

7   action against the insurer and a suit simply against the

8   insured.  And I think that Limit acknowledges that in its

9   Motion for Rehearing that in the North American case it was not

10  a direct action against the insurer, so that argument is quite

11  simply without moment.

12          It's clear in this case that the insurer had

13  knowledge back in December or January -- December of '04,

14  January of '05, and it didn't issue its reservation of rights

15  letter until nine months later.  Under all of the various cases

16  out of the Eastern District, out of the Fifth Circuit, and

17  Louisiana state cases, it is very clear that there is a waiver

18  here.  And all of the cases that we're talking about Peavey,

19  Steptore, North American, courts found waivers in all of those

20  cases.  Some of those cases are even as egregious as this case.

21  In a few of the cases you're talking about a two or three month

22  delay between knowledge and the reservation of rights.  In this

23  case you're talking about an almost nine-month delay.  Four

24  months before the original scheduled trial was when the

25  reservation of rights letter went out.

1          There is no distinction in any -- there are no

2   distinctions drawn in any of the cases with respect to the type

3   of policy.  And what Mr. Gray is asking for is an exception to

4   the general rule of Steptore that if an insurer is defending

5   uninsured claims, it has to reserve its rights.  He's asking

6   for an exception to that rule for this type of policy and

7   there's not a single case that supports that argument.

8          For that reason there's no basis for a rehearing.

9   The Court was correct in concluding that Limit has waived any

10  coverage defenses and the Motion for Rehearing should be

11  denied.

12          THE COURT:  Thank you.

13          MR. GRAY:  May I briefly respond?

14          THE COURT:  Yes, sir.

15          MR. GRAY:  Thank you.

16          Judge, there's a distinction between a reservation of

17  rights and a denial of coverage which I think is important.  In

18  this case there wasn't any reason to issue a reservation of

19  rights because there was no coverage.  In cases like Steptore,

20  the broad duty to defend has caused an insurer properly to

21  defend both covered and not covered claims.  And when you have

22  that situation you have the potential for the conflict.

23          In this case what I would tell them to do in the

24  future if they lose this situation is you deny coverage

25  immediately and you provide no defense.  And if they paid a

1    premium thinking they'd get a defense of this type of claim,

2    too bad, because you're liable to get stuck for something you

3    don't cover.  And when you deny coverage it's inconsistent to

4    provide a defense, but it's also inconsistent to reserve rights

5    when all the allegations in the complaint aren't covered,

6    because that gives rise to denial of coverage and no defense.

7           So, that's what makes this situation, I think,

8    genuinely different is that you don't have a defense of insured

9    and uninsured claims and that's what gives rise to -- partly

10   gives rise to the conflict and the type of things Steptore

11   wants to prevent.

12          Now, North American didn't discuss this, and I don't

13   know if this was raised in Judge Fallon's District Court

14   opinion which the Court adopted, but there the insured did pay

15   $25,000 toward fees and there were other issues, but conflict

16   wasn't addressed.  The only thing before the Fifth Circuit is

17   whether the Tate case by the Louisiana Supreme Court some years

18   back which appeared to hold you can't expand coverage due to

19   waiver, that's what was appealed on that basis, and the Court

20   held the Tate case is really no longer the law; you can, and

21   that's true, it's no longer the law.  So, they didn't address

22   what happens when there's no conflict of interest.

23          As far as the reports going to Limit, they did.  I

24   asked Ron Johnson about that.  A lot of us as Defense Counsel

25   report to Limit and the brokers, and the brokers normally send

1   it to their insured.  I would have expected Morrison as Dean's

2   agent to request Energy Marine for copies of the reports in

3   this situation where Morrison knew there was no coverage just

4   to keep abreast of it.  Morrison didn't; that's not their

5   practice.  So, they didn't receive the reports.

6           But what usually happens, the reports are issued, the

7   assured's insurance agent asks for copies so it can monitor it.

8   So, the reports weren't issued to somehow exclude Dean or its

9   insurance agent from getting the reports.  It was that the

10  agent didn't ask for copies of the reports.  And I don't think

11  that's something that should cause the Court to rule one way or

12  the other in this case.

13          But again the thing I'm trying to stress and I'll

14  retire after that is that if the Court believes there's no

15  conflict of interest, I think it calls for a different ruling.

16  If the Court believes there's an issue as to what was agreed

17  between Morrison and Limit as to how this program would work in

18  terms of coverage for a defense as opposed to liability, a

19  summary judgment should be denied, because it's a very material

20  fact and there are witnesses on that.  There are the Morrison

21  witnesses, there are three of those.  There are two Energy

22  Marine witnesses and there's Mr. Sprouse and then London, and

23  we felt that there were material issues.

24          And just to finish, quite frankly, I was somewhat

25  nonplussed at having a -- we tried to write an erudite brief,

1  but in your ruling my brief isn't mentioned at all and none of

2  the contested facts that I alleged are mentioned or

3  distinguished.  I assume you gave consideration to those, but

4  it was sort of surprising because I do think that they bear

5  serious thought as to the underpinning principle of conflict

6  and as to the facts as to this program if they were agreed how

7  it would operate between Morrison for Dean and Energy Marine

8  for Limit.

9          If you have anything you'd like to ask, I'm here.

10         THE COURT:  Thank you very much.

11         MR. GRAY:  Thank you very much, Judge.

12                 *    *    *    *    *

13             (Hearing is Concluded)

14

15

16

17

18

19

20

21

22

23

24

25

# C E R T I F I C A T E

       I certify that the foregoing is a correct transcript from the electronic sound recording of the proceeding in the above-entitled matter.

/S/Dorothy M. Bourgeois            11/30/06
 DOROTHY M. BOURGEOIS             DATE